# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **STEWART TITLE GUARANTEE COMPANY,** | } | |
| | } | |
| **Plaintiff/Counterclaim Defendant,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:08-CV-00267-RDP** |
| | } | |
| **SHELBY REALTY HOLDINGS, LLC,** | } | |
| | } | |
| **Defendant/Counterclaim Plaintiff.** | } | |

## MEMORANDUM OPINION

The court has before it the June 25, 2009 motion of Plaintiff Stewart Title Guarantee Company (hereinafter "Stewart Title") for summary judgment (Doc. #25).  Pursuant to the court's orders of July 15 and 24, 2009, as well as the order of August 11, 2009, the motion for summary judgment (Doc. #25) is now under submission and is considered herein without oral argument.[1]

Having considered the briefs and evidentiary submissions, the court finds that the motion for summary judgment is due to be granted in part and denied in part.

## I.    Relevant Procedural History

Stewart Title commenced this action on February 13, 2008 by filing a complaint (Doc. #1) for declaratory judgment in this court.  (*See generally* Complaint, hereinafter "Compl.").  The named Plaintiff to the Complaint seeks a determination from this court that a $500,000.00 Endorsement to the Title Policy should be rescinded because of Shelby Realty Holdings, LLC's (hereinafter "Shelby

---

[1] Also pending before the court is Shelby Realty Holdings, LLC's Motion to Strike Parol Evidence (Doc. #38) filed on August 10, 2009.  Because summary judgment is herein denied in relevant part, the Motion to Strike (Doc. #38) is **MOOT** at this stage of the proceedings.  (*See* footnote 25, *infra*).

Realty") alleged failure to disclose necessary facts regarding the state of title to the Property, and that the Title Policy should be reformed to be in the amount of $3,500,000.00. (*See* Count I, Compl. ¶ 22). In Count II of the Complaint, Stewart Title seeks a declaration from the court that it has paid all amounts due and owing to Shelby Realty under the Title Policy for the difference in value between the insured estate and the value of the insured estate subject to the defect, that Stewart Title has no liability to Shelby Realty under the Title Policy, and that Stewart Title is not obligated to make any payments to Shelby Realty on its claim as requested in the Proof of Loss. (*See* Count II, Compl. ¶ 25).

On March 6, 2008, Shelby Realty timely filed an Answer (Doc. #6) to the Complaint, which included the following counterclaims: breach of contract (Count I); bad faith (Count II); breach of a Title Insurance Policy (Count III); and misrepresentation (Count IV). On April 15, 2008, Stewart Title filed a reply (Doc. #8) to the counterclaims.

Plaintiff/Counter Defendant Stewart Title now contends in its motion for summary judgment that it is entitled to judgment as a matter of law in its favor with regard to its claims for declaratory judgment, and with regard to all counterclaims asserted by Shelby Realty. As grounds for summary judgment Stewart Title argues: (1) the endorsement to the policy is due to be rescinded because of Shelby Realty's alleged failure to disclose that Birmingham-Southern College ("BSC" or the "College") was challenging Shelby Realty's ownership of the Property, and because Shelby Realty was making ground lease payments to the college; (2) Stewart Title has paid in full pursuant to the terms of the policy; (3) Stewart Title did not breach the terms of the policy issued to Shelby Realty; (4) Stewart Title paid Shelby Realty all damages due to it under the terms of the policy and had a

debatable reason for refusing to make any further payments; and (5) Stewart Title made no representations to Shelby Realty.  (*See* Doc. #26 at i).

The parties have each filed briefs and submitted evidence in support of their respective positions concerning the pending motion for summary judgment.  On June 25, 2009, Stewart Title submitted evidence[2] (Docs. #27, 28, 29, 30, 31, 32) in support of its motion for summary judgment and also filed a supporting memorandum brief (Doc. #26).  Shelby Realty submitted evidence[3] (Doc. #35) in opposition to the motion for summary judgment on July 16, 2009 and on the same date filed an opposing brief (Doc. #34).  On July 24, 2009, Stewart Title filed a reply (Doc. #37) to Shelby Realty's opposition.

---

[2] Plaintiff Stewart Title submitted the following: ground lease dated September 30, 1981 (Exhibit 1); modification agreement dated January 7, 1983 (Exhibit 2); affidavit of John Baker dated January 26, 2005 (Exhibit 3); affidavit of Daryl J. Wulf dated February 16, 2005 (Exhibit 4); deposition of John Baker dated February 12, 2009 (Exhibit 5); deposition of Maston E. Martin, Jr. dated February 11, 2009 (Exhibit 6); deposition of Ed Covington dated March 19, 2009 (Exhibit 7); Birmingham Title Order Form (Exhibit 8); Title Commitment issued to Shelby Realty (Exhibit 9); Owner's Policy issued to Shelby Realty (Exhibit 10); endorsement to Owner's Policy issued to Shelby Realty (Exhibit 11); lawsuit filed by Birmingham-Southern College against Shelby Realty (Exhibit 12); letter dated October 26, 2004 from John Baker to Stewart Title (Exhibit 13); letter dated November 22, 2004 from Stewart Title to Shelby Realty (Exhibit 14); letter dated February 3, 2005 from Stewart Title to Shelby Realty (Exhibit 15); Judge Smallwood's Redemption Order dated May 19, 2004 (Exhibit 16); Judge Smallwood's order dated April 22, 2005 (Exhibit 17); Judge Smallwood's Order dated June 21, 2005 (Exhibit 18); the Alabama Supreme Court's Opinion dated February 9, 2007 (Exhibit 19); letter dated November 22, 2005 from Stewart Title to Jack Held (Exhibit 20); appraisal of Lonnie Tidwell dated April 13, 2006 (Exhibit 21); appraisal of Richard Maloy dated May 22, 2006 (Exhibit 22); letter dated June 29, 2007 from Stewart Title to Tom Curtin (Exhibit 23); letter dated January 8, 2008 from Bruce Rogers to Stewart Title and Proof of Loss form (Exhibit 24); second appraisal of Richard Maloy dated August 25, 2006 (Exhibit 25); and deposition of Richard Maloy dated June 4, 2009 (Exhibit 26).

[3] Defendant submitted the following in opposition to summary judgment: declaration of John P. Baker, including attached exhibit (Exhibit 27); and Purchase and Sale Agreement dated December 28, 2006 between Shelby Realty holdings, LLC and Birmingham-Southern College (Exhibit 28).

II.    **Legal Standards for Evaluating a Summary Judgment Motion**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden

4

on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.* facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest

on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.   Relevant Undisputed Facts[4]

### A.   Introduction

This action concerns a title insurance dispute between Shelby Realty and Stewart Title, involving a parcel of real property ("the Property") formerly owned by Shelby Realty.  In September 1981, Hilltop Terrace, Ltd., ("Hilltop Terrace") as Lessee, entered into a 75-year ground lease with Birmingham-Southern College, as Lessor, for the Property.  (*See* Doc. #26 at 1, ¶ 1; *see also* Doc. #34 at 1).  In 1983, in order to obtain the financing necessary to construct what are now known as the "Hilltop Terrace Apartments," Hilltop Terrace entered into an agreement with BSC to subordinate BSC's interest in the property to the interest of the provider of the mortgage, the Highland Mortgage Company (the "Modification Agreement").[5]  (*See* Doc. #26 at 1, ¶¶ 3, 4; *see also* Doc. #34 at 1).  The Modification Agreement was recorded in the records of the Probate Court of Jefferson County, Alabama.  (*See* Doc. #26 at 1, ¶ 3).

---

[4] If the facts are in dispute, they are stated in the manner most favorable to non-moving party. *Fitzpatrick*, 2 F.3d at 1115.

[5] Central to Shelby Realty's argument is that the defect in Shelby Realty's title to the Property was a result of a misinterpretation of the Modification Agreement.  (*See* Doc. #34 at 25, ¶ 2).  That point is disputed by Stewart Title, which argues that "it was not at all clear that the College retained its fee interest in the Property under the terms of the Modification Agreement, and that Shelby Realty learned at least as early as July 7, 2003 that the College was taking this position, and failed to disclose this fact to Stewart Title." (Doc. #37 at 8, ¶¶ 1-2).  This point is further discussed in the analysis section of this Memorandum Opinion.

### B.     Involvement of Shelby Realty in the Property

On May 29, 2003, Shelby Realty purchased the mortgage on the Property from Bank Midwest N.A. (which had acquired the mortgage from the Highland Mortgage Company).[6]  (*See* Doc. #26 at 2, ¶ 5; *see also* Doc. #34 at 5, ¶ 5).  On the same day, Shelby Realty foreclosed on the Property.  (*See* Doc. #26 at 2, ¶ 6; *see also* Doc. #34 at 5, ¶ 6).  The foreclosure deed was recorded in the records of the Probate Court of Jefferson County, Alabama on June 10, 2003.  (*See* Doc. #26 at 2, ¶ 7; *see also* Doc. #34 at 6, ¶ 7).

During the first week in June 2003,[7] John Baker, a member of Shelby Realty responsible for the operations of the company, met at BSC with Dr. Neal Berte, who at the time was the President of BSC, and with Jay Wulf, who at the time was the Investment Manager of BSC.[8]  (*See* Doc. #26 at 2, ¶¶ 8-9; *see also* Doc. #34 at 6, ¶¶ 8-9).  In the course of that meeting, Mr. Baker told Dr. Berte and Mr. Wulf that Shelby Realty had acquired fee simple title to the Property by foreclosure.  (*See* Doc. #26 at 2, ¶ 10; *see also* Doc. #34 at 6, ¶ 10).  At the request of Dr. Berte, the day following the meeting, Mr. Baker faxed to Dr. Berte documentation evidencing Shelby Realty's acquisition of the property.  (*See* Doc. #26 at 3, ¶ 11; *see also* Doc. #34 at 6, ¶ 11).  Some time after the initial meeting,

---

[6] Shelby Realty initially managed the Property as apartments because, at the time of foreclosure, existing leases remained among the previous owner's tenants.  (*See* Doc. #34 at 25, ¶ 3).  However, as each unit became vacant, Shelby Realty renovated that unit.  (*See* Doc. #34 at 25, ¶ 5).  Once all of the leases had expired, and the units had all been renovated, including extensive renovations to the common areas of the Property, Shelby Realty intended to convert the Property to condominiums and sell the individual units to students attending the College, in order to house the students and/or to be used as investment properties.  (*See* Doc. #34 at 26, ¶ 6).

[7] The actual date is in dispute, but there is no evidence to suggest that the meeting occurred later than the first week in June.  (*See* Doc. #34 at 6, ¶ 9; *see also* Doc. #37 at 2, ¶ 9).

[8] Shelby Realty disputes that Mr. Wulf was present at the meeting, but there is no Rule 56 evidence to support its denial.  (*See* Doc. #34 at 6, ¶ 9; *see also* Doc. #37 at 1, ¶ 9).

Mr. Baker met again with officials of BSC, at which meeting "the College took the position that the mortgage covered only a leasehold estate and not the fee title."[9]  (Doc. #26 at 3, ¶ 12; *see also* Doc. #34 at 6-7, ¶ 12).

Shortly after the June meeting, payments began to be made to BSC.[10]  (*See* Doc. #26 at 3, ¶ 14; *see also* Doc. #34 at 7, ¶ 14).  The parties dispute who the initial payment came from.  Mr. Wulf testified that a "rent check was received by the College for $1542.25 from Shelby on June 20, 2003.  This is exactly the amount required by paragraph 2(a) of the Ground Lease.  The check contained no reservation of rights or other notations . . ."  (Doc. #26 at 3, ¶ 15).  However, Shelby Realty contends that Dalcor, the company retained by Shelby Realty to handle the management of the Property (which was the same company used by the previous owners to manage the Property), continued making payments to the College after Shelby Realty purchased the Property at the foreclosure sale.  (*See* Doc. #34 at 7, ¶ 14).  That payment, Shelby Realty contends, was made without any knowledge on the part of Shelby Realty.[11]  (*See* Doc. #34 at 7-8, ¶¶ 14-16).  Payments

---

[9] Mr. Baker testified that he did not believe the College had taken any position in regard to its title to the Property by early July 2003, and his affidavit provides no date certain for the second meeting.  (*See* Doc. #34 at 6-7, ¶ 12; *see also* Doc. #37 at 2-3, ¶ 12).  Mr. Wulf, however, testified that the second meeting occurred on July 7, 2003 and at the meeting "the possibility of a settlement [between the College and Shelby Realty] was first discussed."  (*See* Doc. #26 at 3, ¶ 13).

[10] Stewart Title contends that the checks were for "rent."  Shelby Realty disputes that point.  "Shelby Realty admits only that Mr. Wulf did testify that the College received 'rent checks' from Shelby Realty, but disputes that any check paid to the College was a 'rent check,' that the amount of the payment was correct under the formula set forth in the Ground Lease, and that the checks were from Shelby Realty."  (Doc. #34 at 8, ¶ 15).

[11] Mr. Baker's deposition testimony does not contradict his affidavit testimony, despite Stewart Title's contention otherwise.  (*See* Doc. #37 at 9, ¶ 4).  Mr. Baker was not asked in his deposition *when* he became aware that a June 2003 payment had been made to BSC.  (*See* Docs. #27-32, Exh. 5 at 66-68).

thereafter continued to be made to BSC by Shelby Realty on the advice of counsel in an attempt to be a "good neighbor" to BSC; BSC agreed that the payments were made and received without prejudice to Shelby Realty's position as to its title to the Property.[12]  (*See* Doc. #34 at 7, ¶ 14; *see also* Doc. #26 at 3-4, ¶ 16).

### C.      The Title Commitment

Birmingham Title Services Corporation ("Birmingham Title"), as an agent for Stewart Title, issued an Owner's Policy in favor of Shelby Realty, Policy No. O-9993-3187451, in the amount of $3,500,000.00, insuring fee simple title to the Property in Shelby Realty.  (*See* Doc. #26 at 4, ¶ 17; *see also* Doc. #34 at 8, ¶ 17).  The paperwork for the title commitment evidences that Mr. Baker, on behalf of Shelby Realty, ordered the title commitment on July 2, 2003, to be delivered on July 9, 2003.  (*See* Doc. #26 at 4, ¶¶ 19-20; *see also* Doc. #34 at 9, ¶ 19).  Stewart Title contends (with supporting evidence) that the effective date of the title commitment is July 8, 2003; Shelby Realty contends (with supporting evidence) that the title issued to Shelby Realty bears a Policy date of June 10, 2003.[13]  (*See* Doc. #26 at 4-5, ¶ 20-21; *see also* Doc. #34 at 9-10, ¶¶ 20-21).  However, Shelby Realty contends (with supporting evidence) that Mr. Baker and Mr. Covington had numerous conversations prior to and after the foreclosure of the property by Shelby Realty, including conversations regarding Shelby Realty's desire and need for a title policy on the Property.  (*See* Doc.

---

[12] Stewart Title was not a party to the agreement between Shelby Realty and BSC that the payments would be made without prejudice to Shelby Realty's position that it owned the Property. (*See* Doc. #37 at 4, ¶ 14).

[13] Mr. Covington testified that the foreclosure date is typically used as the policy date. (*See* Doc. #, Exh. 5 at 31).  The court reserves for another day the question of whether the parol evidence rule bars evidence that the Policy and the title commitment were not actually delivered to Shelby Realty until on or after July 8, 2003. (*See* Doc. #38 at 3; *see also* footnote 1, *supra* and footnote 25, *infra*).

#34 at 8-9, ¶ 19).  Further, Shelby Realty contends that Mr. Covington was aware of Shelby Realty's need for a title policy on the Property prior to July 2003, and was aware of Shelby Realty's intent to seek such a policy from Birmingham Title and Stewart Title prior to the foreclosure.  (*See* Doc. #34 at 8-9, ¶ 19).

It is disputed whether Shelby Realty had knowledge of BSC's intent to challenge Shelby Realty's fee simple title to the Property at the time of the order of the title commitment[14] – what is not in dispute is that, at time the title commitment was ordered, Shelby Realty, through Dalcor, had made at least one payment to BSC.[15]  (*See* Doc. #34 at 10, ¶ 22-24; *see also* Doc. #26 at 5, ¶¶ 22-24).

### D.    Additional Coverage

Approximately ten months after the issuance of the original coverage, Mr. Baker contacted Birmingham Title seeking an endorsement to the Policy to add an additional $500,000.00 in coverage.  (*See* Doc. #26 at 6, ¶ 29; *see also* Doc. #34 at 14, ¶ 29).  The Endorsement was issued on April 7, 2004.  (*See* Doc. #26 at 6, ¶ 30; *see also* Doc. #34 at 14, ¶ 30).  At that time, Mr. Baker had engaged in no conversations with Mr. Covington concerning meetings and discussions Mr. Baker had been having with the College to resolve the College's claim that it had fee simple title to the

---

[14] That is, Shelby Realty disputes that it had any knowledge of BSC taking any definitive position in regard to Shelby Realty's title to the Property prior to the issuance of the Policy, and disputes that it failed to inform Mr. Covington of its meetings with officials of the College.  (*See* Doc. #34 at 10-11, ¶ 24).  Further, Shelby Realty disputes that Mr. Baker was aware of the College's intent to claim fee simple ownership of the Property prior to the issuance of the Policy.  (*See* Doc. #34 at 13, ¶ 26).

[15] Shelby Realty disputes that Mr. Baker was aware, at the time he met with Mr. Covington, that any payment had been made by Dalcor to BSC.  (*See* Doc. #34 at 20, ¶ 23).

Property.[16]  (*See* Doc. #26 at 6-7, ¶ 31).  Further, at the time of the issuance of the Endorsement, Shelby Realty did not disclose to Birmingham Title that payments had been made to the College as early as June 2003.  (*See* Doc. #26 at 7, ¶ 33; *see also* Doc. #34 at 15, ¶ 33).

### E.    The State Court Case

Less than two weeks after the Endorsement was issued to Shelby Realty, on April 20, 2004, BSC filed suit against Shelby Realty in the Circuit Court of Jefferson County, alleging that the College had fee simple title to the Property, and that Shelby Realty only possessed Hilltop Terrace, Ltd.'s leasehold interest in the Property.  (*See* Doc. #26 at 7-8, ¶ 35; *see also* Doc. #34 at 16, ¶ 35).  On October 26, 2004,[17] Mr. Baker wrote to Stewart Title and requested that Stewart Title provide a defense in connection with the lawsuit. (*See* Doc. #26 at 8, ¶ 36; *see also* Doc. #34 at 16, ¶ 36).  Stewart Title agreed to defend Shelby Realty under a reservation of rights on November 22, 2004. (*See* Doc. #26 at 8, ¶ 37; *see also* Doc. #34 at 16, ¶ 37).  Then, on February 3, 2005, Stewart Title issued a supplemental reservation of rights letter to Shelby Realty, advising that Stewart Title had learned of additional facts relevant to Stewart Title's duty to defend and indemnify Shelby Realty under the terms of the Policy.[18]  (*See* Doc. #26 at 8, ¶ 38; *see also* Doc. #34 at 16, ¶ 38).

---

[16] Mr. Covington testified that had Mr. Baker made such disclosures, the Endorsement would not have been issued.  (*See* Doc. #26 at 7, ¶ 32).  However, there is no provision in the Policy that requires Shelby Realty to disclose attempts to resolve "meritless" claims regarding title to the Property.  (*See* Doc. # 34 at 14, ¶ 31).

[17] Stewart Title makes no claim that it was prejudiced by the timing of Shelby Realty's request for a defense.  (*See* Doc. #34 at 16, ¶ 38).  It is undisputed that Stewart Title was kept abreast of the BSC lawsuit by appointed counsel, Guy Martin, who reported to Mickey Martin of Stewart Title.  (*See* Doc. #34 at 27, ¶ 12).

[18] Specifically, the letter mentioned the following: Shelby Realty had been making Ground Lease payments to the College subsequent to the date of the Policy; Shelby Realty had failed to advise Stewart Title that the College was claiming an interest in the Property which survived the

On April 22, 2005, Judge Smallwood entered an Order in the BSC lawsuit granting the College's motion for summary judgment, and holding that the only interest mortgaged by the original mortgagor, Hilltop Terrace, Ltd., was a "leasehold estate," and that the College retained its fee simple interest in the Property.  (*See* Doc. #26 at 9, ¶ 40; *see also* Doc. #34 at 17, ¶ 40).  Shelby Realty filed a motion for reconsideration, and while Judge Smallwood affirmed his earlier order granting summary judgment, he held that the College was not entitled to any rents or fees as provided for in the terms of the Ground Lease.  (*See* Doc. #26 at 9, ¶ 41; *see also* Doc. #34 at 17, ¶ 41).  During the pendency of an appeal, Stewart Title sent a letter to Shelby Realty's outside counsel, Jack Held, concerning the extent of Stewart Title's liability under the terms of the Policy and setting out a process for obtaining appraisals in order to determine the amount of loss owed to Shelby Realty pursuant to Paragraph 7(a)(ii) of the Policy.[19]  (*See* Doc. #26 at 10, ¶ 44; *see also* Doc. #34 at 18, ¶ 44).

BSC retained Lonnie Tidwell of CVS Valuation Services to perform an appraisal of the Property on its behalf, and found that the difference in value between fee simple interest and the Ground Lease interest was $282,000.00 if the Property was used as apartments.  (*See* Doc. #26 at 10, ¶ 45; *see also* Doc. #34 at 18, ¶ 45).  Shelby Realty retained Richard Maloy of Maloy & Company to perform an appraisal on its behalf, and Mr. Maloy found that the difference in value between a fee simple interest and the Ground Lease interest was in the amount of $6,060,000.00 if the property was utilized as condominiums (as Shelby Realty contends was its intention), and the

---

foreclosure; and Shelby Realty failed to advise Stewart Title that Shelby Realty was engaged in settlement negotiations with the College.  (*See* Doc. #26 at 8, ¶ 38; *see also* Doc. #34 at 16, ¶ 38).

[19] Shelby Realty disputes that using appraisals to value the Property is the only means of determining the amount of loss to Shelby Realty under the Policy.  (*See* Doc. #34 at 18, ¶ 44).

difference in value between fee simple interest and the Ground Lease interest was in the amount of $264,000.00, if the Property was utilized as apartments. (*See* Doc. #34 at 18-19, ¶ 46; *see also* Doc. #26 at 11, ¶ 46). Three months after preparing that initial appraisal, Mr. Maloy performed a second appraisal and valued the Property at $14,260,000.00 based upon condominium use.[20] (*See* Doc. #26 at 13, ¶ 57; *see also* Doc. #34 at 22, ¶ 57).

The Alabama Supreme Court affirmed Judge Smallwood's rulings without opinion on February 9, 2007. (*See* Doc. #26 at 9, ¶ 42; *see also* Doc. #34 at 17, ¶ 42).

## F.    Shelby Realty Sells the Property and Stewart Title Pays Shelby Realty

On December 28, 2006, Shelby Realty and BSC entered into a Purchase and Sale Agreement whereby Shelby Realty sold to a subsidiary of BSC its interest in the Property for $7,728,000.00 and Shelby Realty quit-claimed to BSC its interest in the Property. (*See* Doc. #26 at 11, ¶ 49; *see also* Doc. #34 at 19, ¶ 49).

On June 29, 2007, Stewart Title sent a letter to Tom Curtin of Shelby Realty enclosing a check in the amount of $264,000.00 as payment for Shelby Realty's loss under the Policy. (*See* Doc. #26 at 11, ¶ 51; *see also* Doc. #34 at 20, ¶ 51). "In determining the amount of loss we [Stewart Title] have relied upon that appraisal report dated May 22, 2006 done by Maloy & Company, Inc. for the insured, provided by the insured to us at our request. The insured's appraisal shows a difference of $264,000.00 in the value of the fee interest as insured under the policy and the value of the interest

---

[20] The second appraisal of the Property, prepared shortly after the initial appraisal, included the fourth scenario based upon Shelby Realty's intended use of the Property as condominiums. The value of the Property when utilized as condominiums was $14,260,000.00, creating a difference in value between a fee simple ownership and leasehold ownership of $6,060,000.00. (*See* Doc. #34 at 22, ¶ 57). Mr. Maloy's second appraisal was not sent to Stewart Title until after the instant lawsuit was filed. (*See* Doc. #26 at 13, ¶ 58; *see also* Doc. #34 at 22-23, ¶¶ 58-59).

in the property under the trial court's order dated June 21, 2005." (Doc. #26 at 11-12, ¶ 52; *see also* Doc. #34 at 20-21, ¶ 52).  The letter also states that the check represents Stewart Title's liability "based on our investigation of this claim," but representatives of Stewart Title admitted that they performed no investigation prior to initiating the instant lawsuit.[21]  (*See* Doc. #34 at 21, ¶ 53; *see also* Doc. #26 at 12, ¶¶ 53-54).

On January 8, 2008, counsel for Shelby Realty sent a letter to Stewart Title enclosing a Proof of Loss[22] on behalf of Shelby Realty.  (*See* Doc. #26 at 12, ¶ 55; *see also* Doc. #34 at 21-22, ¶ 55). In the Proof of Loss, Shelby Realty alleges that it had suffered damages exceeding the limits of the Policy in the amount of $4,000,000.00 because Shelby Realty had intended to refurbish the apartments, convert them into condominiums, and sell them to students (or their parents) attending BSC.  (*See* Doc. #26 at 13, ¶ 56; *see also* Doc. #34 at 22, ¶ 56).

## IV.   <u>Analysis</u>

As earlier set out, Plaintiff/Counter Defendant Stewart Title maintains that it is entitled to judgment as a matter of law with respect to its claims for declaratory judgment because: (1) the Endorsement to the Policy is due to be rescinded because of Shelby Realty's failure to disclose that the College was challenging Shelby Realty's ownership of the Property, and because Shelby Realty was making Ground Lease payments to the College; and (2) Stewart Title has paid Shelby Realty in

---

[21] It is undisputed that at no time in the process of Shelby Realty seeking the Policy or Endorsement from Stewart Title, through Mr. Covington and Birmingham Title, did Mr. Covington, Birmingham Title, or Stewart Title pose any questions to Shelby Realty regarding the Property, seek any additional information from Shelby Realty, nor conduct any independent research, other than Birmingham Title's title search for the Property.  (*See* Doc. #34 at 26, ¶ 8).

[22] Stewart Title had not requested that Shelby Realty submit a Proof of Loss.  (*See* Doc. #34 at 21-22, ¶ 55).

full pursuant to the terms of the Policy.  Plaintiff/Counter Defendant Stewart Title also maintains that it is entitled to judgment as a matter of law with respect to all counterclaims asserted by Shelby Realty because: (1) Stewart Title did not breach the terms of the Policy issued to Shelby Realty; and (2) Stewart Title made no representations to Shelby Realty.

Each of the possible grounds for summary judgment are considered below.

### A.   Declaratory Judgment Claims

#### 1.   Whether the Endorsement to the Policy is Due to be Rescinded (Count I of the Complaint)

Stewart Title seeks a declaratory judgment from the Court that the Endorsement to the Policy in the amount of $500,000.00 is due to be rescinded and the Policy is due to be reformed in the amount of $3,500,000.00 because of Shelby Realty's alleged failure to disclose to Stewart Title that BSC was challenging Shelby Realty's fee simple ownership of the Property at the time the Endorsement was received.  (*See* Doc. #26 at 15).

To answer the question of whether the Endorsement is due to be rescinded, the court must first look at the language of the Policy itself.  The "Exclusions From Coverage" set forth in the Policy provide, in pertinent part, as follows:

> The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of: . . .
>
> 3.    Defects, liens, encumbrances, adverse claims or other matters:
>    (a)    created, suffered, assumed or agreed to by the insured claimant; [and]
>    (b)    not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured through this policy;
>    (c)    resulting in no loss or damage to the insured claimant;
>    (d)    attaching or created subsequent to Date of Policy; or

(e)     resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

(*See* Docs. #27-32, Exh. 10 at ¶ 3, "Exclusions from Coverage").  Paragraph 3 of the Conditions and Stipulations of the Policy, provides, in pertinent part, as follows:

> The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, . . . If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

(*See* Docs. #27-32, Exh. 10 at ¶ 3, "Conditions and Stipulations").  The Endorsement, which was issued on April 7, 2004, states as follows:

> This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof . . . except that the insurance afforded by this endorsement is not subject to Section 3(d) of the Exclusions from Coverage.

(*See* Docs. #27-32, Exh. 11).  The Endorsement thus makes clear that Section 3(d) of the Policy's exclusions no longer applies.  This means that the additional $500,000 of coverage in the Endorsement applies even for "[d]efects, liens, encumbrances, adverse claims or other matters . . . attaching or created subsequent to Date of Policy."  (*See* Docs. #27-32, Exh. 11 at 52-53).  Thus, in order to rescind the Policy and Endorsement, Stewart Title must present evidence that Shelby Realty discovered an "adverse claim" prior to the Date of Policy.  Shelby Realty does not dispute that this is its burden.  (*See* Doc. #37 at 12).

Stewart Title's argument is that Shelby Realty violated two aspects of the Policy in that: (1) Shelby Realty failed to disclose to Stewart Title in writing that BSC was challenging Shelby Realty's fee simple ownership in the Property; and (2) Shelby Realty failed to disclose to Stewart Title in writing that Shelby Realty was making Ground Lease payments to the College. (*See* Doc. #26 at 16-17; *see also* Doc. #34 at 44-45). Shelby Realty counters that, "based upon the plain language of the Endorsement," there are outstanding issues of genuine disputed fact as to what constitutes an "adverse claim," and as to the date Shelby Realty became aware of any "adverse claim." (*See* Doc. #34 at 45).

Shelby Realty does not contend that such a limiting condition is unreasonable, and with good reason. Alabama has long recognized that exclusions and limiting conditions in insurance policies are valid and enforceable. "Such limiting conditions are not unreasonable, are set forth in clear and unambiguous language, and have been recognized repeatedly." *Conway v. Title Ins. Co.*, 277 So.2d 890, 893 (Ala. 1973). (*See* Doc. #34 at 48). The company does dispute, however, that the BSC lawsuit and/or the Ground Lease payments qualify as "defects, liens, encumbrances, adverse claims or other matters" excluded from coverage. (*See* Doc. #34 at 46). There is no Alabama case law directly on point to define what constitutes an adverse claim, but other courts have interpreted similar provisions as "clearly exclud[ing] from coverage those claims which the insureds had knowledge about, but failed to disclose in writing to the insurer . . ." and "threatened litigation." *Kirwan v. Chicago Title Ins. Co.*, 612 N.W.2d 515, 524 (Neb. App. 2000); *see also Commonwealth Land Title Ins. Co. v. IDC Properties, Inc.*, 524 F. Supp.2d 155 (D.R.I. 2007) and *Safeco Title Ins. Co. v. Moskopoulos*, 116 Cal. App. 3d 658, 667 (1981). And although those cases are, of course, not binding on this court, Shelby Realty cites no case law suggesting an opposite definition of an

17

"adverse" claim.  (*See* Doc. #34 at 46-49).  Thus, it is reasonable to conclude that the language of the "Exclusions from Coverage" was intended to force the insureds to tell Stewart Title what they knew or came to know about the Property and its title, so that the risk which Stewart Title was guarding against could be properly assessed and guarded against.  *See Kirwan*, 612 N.W.2d at 524.

So the question becomes whether Shelby Realty violated the Policy by failing to inform Stewart Title of "adverse claims" of which it had knowledge at the time the Policy was issued. Although Stewart Title mentions only two potential "adverse" claims – the discussion with representatives from BSC and the Ground Lease payments – in reality each of those "adverse" claims stems from the original potentially "adverse" claim – the Modification Agreement.  (*See* Doc. #26 at 16-17; *see also* Doc. #34 at 44-45).

The Modification Agreement was duly recorded in the records of the Probate Court of Jefferson County shortly after it was entered into in 1983.  (*See* Doc. #26 at 1, ¶ 3).  Because of the public recording, Shelby Realty bore no responsibility to inform Stewart Title of its existence.[23]  (*See* Docs. #27-32, Exh. 10, at ¶ 3).  Stewart Title was well aware of the Modification Agreement prior to its issuance of the Endorsement.  In fact, Stewart Title reviewed the Modification Agreement and determined that it subordinated the College's interest in the property, such that a foreclosure by Shelby Realty resulted in Shelby Realty purchasing a fee simple interest in the Property.  That mistaken interpretation of the Modification Agreement formed the basis for the College's adverse

---

[23] *See* footnote 5, *supra*.  Central to Shelby Realty's argument is that the defect in Shelby Realty's title to the Property was a result of a misinterpretation of the Modification Agreement.  (*See* Doc. #34 at 25, ¶ 2).  That point is disputed by Stewart Title, which argues that "it was not at all clear that the College retained its fee interest in the Property under the terms of the Modification Agreement, and that Shelby Realty learned at least as early as July 7, 2003 that the College was taking this position, and failed to disclose this fact to Stewart Title."  (Doc. #37 at 8, ¶¶ 1-2).

claim.  Therefore, because the Modification Agreement was known not only to Shelby Realty, but also to Stewart Title prior to the issuance of the Endorsement, Stewart Title is not entitled to have the Endorsement rescinded.

But the question of Shelby Realty's responsibility to keep Stewart Title informed is murkier when considering the discussions with BSC and the Ground Lease payments.  Although the Modification Agreement was less than clear, at some point during the summer months of 2003 Shelby Realty became aware that BSC took the position that the Modification Agreement covered only a leasehold estate, and not the fee title.  (*See* Doc. #26 at 3, ¶ 12; *see also* Doc. #34 at 6-7, ¶ 12). The date that this actually occurred is in dispute.[24]  (*See* discussion, *supra*, Section III.B.).  In early June, a Ground Lease payment was made by Dalcor to BSC, but the parties dispute whether it was made without the knowledge of Shelby Realty.  (*See* Doc. #26 at 3-4, ¶¶ 14-16; *see also* Doc. #34 at 7-8, ¶¶ 14-16).  The action of making Ground Lease payments calls into question the type of ownership Shelby Realty maintained over the Property.  And the disputed timing of these events is important.  While Stewart Title contends that the effective date of the title commitment is July 8, 2003, Shelby Realty contends that the Policy was actually issued much earlier, on June 10, 2003. (*See* Doc. #26 at 4-5, ¶¶ 20-21; *see also* Doc. #34 at 9-10, ¶¶ 20-21).  Thus, it is not clear whether Shelby Realty knew of the "adverse claims" at the time the Policy was issued, and therefore whether Shelby Realty had any duty to disclose such claims to Stewart Title.  Because material facts are in

---

[24] The court need not decide, at this stage of the proceedings, whether evidence presented by Stewart Title on the question of the dates is barred by the parol evidence rule.  (*See generally* Doc. #38).  This is because, even assuming the inadmissibility of such evidence, summary judgment would nonetheless be due to be denied because Shelby Realty would have established that it was not aware of adverse claims prior to the issuance of the Endorsement.

dispute related to the timeline of events, it is not clear that the Endorsement is due to be rescinded, and Stewart Title's motion for summary judgment on that point is due to be denied.

### 2. Whether Shelby Realty has been Paid in Full Pursuant to the Terms of the Policy (Count II of the Complaint)

Stewart Title's second argued ground for declaratory judgment is that Shelby Realty has been fully compensated for any loss suffered under the terms of the Policy, and that Shelby Realty is not entitled to any compensation under the Policy for its alleged intended use of the Property as condominiums. (*See* Doc. #26 at 22). Shelby Realty counters that Alabama law and disputed issues of material fact dictate denial of declaratory judgment on that ground as well. (*See* Doc. #34 at 30).

Paragraph 7 of the Conditions and Stipulations of the Policy, entitled "**DETERMINATION, EXTENT OF LIABILITY AND COINSURANCE,**" provides as follows:

> This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.
>
> (a)    The liability of the Company under this policy shall not exceed the least of :
>
> (i)    The Amount of Insurance stated in Schedule A; or,
>
> (ii)    the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(*See* Exhibit 10, ¶ 7 of the "Conditions and Stipulations").

The parties' dispute centers on how this court should determine liability under the Policy. Is Shelby Realty entitled to damages related to its intended use of the Property, or only for the way the Property was actually used at the time of the loss? Shelby Realty contends it is the former, while

Stewart Title contends it is the latter.  But neither party cites to Alabama case law directly on point.

Shelby Realty urges the court to adopt general Alabama law relating to real property and the

Alabama law of eminent domain on proper valuation in title insurance disputes.  (*See* Doc. #34 at

34).  Stewart Title urges the court to adopt law from other jurisdictions which measure loss only by

the use to which the property was then being devoted.  (*See* Doc. #26 at 24-25).

The non-binding authority which Stewart Title cites for valuation in title insurance disputes

is well-reasoned.  It is logical that an insured be protected for loss including any inflation of value

from the date of the policy to the date of the discovery of the defect, but that recovery be limited and

measured by the use to which the property was being devoted at the time of the discovery of the

defect.[25]  *See Overholtzer v. Northern Counties Title Ins. Co.*, 116 Cal. App.2d 113, 117, 125 (1953).

Indeed numerous other courts have adopted and applied *Overholtzer* to title insurance disputes.  *See*

*e.g., Hartman v. Shambaugh*, 96 N.M. 359, 630 P.2d 758 (1981); *Happy Canyon Invest. Co. v. Title*

*Ins. Co. of Minn.*, 38 Colo. App. 385, 560 P.2d 839 (1976); *Allison v. Ticor Title Ins. Co.*, 907 F.2d

645 (7th Cir. 1990), 979 F.2d 1187 (7th Cir. 1992); *Swanson v. Safeco Title Ins. Co.*, 186 Ariz. 637,

925 P.2d 1354 (App. 1995).  But Alabama has not made such application, and this court is bound

---

[25] "It seems quite apparent to us that liability should be measured by diminution in the value of the property caused by the defect in title as of the date of the discovery of the defect, measured by the use to which the property is then being devoted.  When a purchaser buys property and buys title insurance, he is buying protection against defects in title to the property. He is trying to protect himself then and for the future against loss if the title is defective. The policy necessarily looks to the future. It speaks of the future. The present policy is against loss the insured 'shall sustain' by reason of a defect in title. The insured, when he purchases the policy, does not then know that the title is defective. But later, after he has improved the property, he discovers the defect. Obviously, up to the face amount of the policy, he should be reimbursed for the loss he suffered in reliance on the policy, and that includes the diminution in value of the property as it then exists, in this case with improvements. Any other rule would not give the insured the protection for which he bargained and for which he paid." *Overholtzer*, 116 Cal. App.2d at 130.

to determine the issue as it believes the Alabama Supreme Court would.[26]  *See CSX Transp., Inc. v. Trism Specialized Carriers, Inc.*, 182 F.3d 788 (11th Cir. 1999) ("As a federal court sitting in diversity, we are required to apply the law as declared by the state's highest court . . . In the absence of authority directly on point, we must determine the issues of state law as we believe the [state] Supreme Court would.") (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) and *Towne Realty, Inc. v. Safeco Ins. Co. of Am.*, 854 F.2d 1264, 1269 (11th Cir. 1988)).  Because the Alabama Supreme Court has spoken on valuation issues in contexts other than that of title insurance disputes, this court is convinced that similar law would apply here.  And in such contexts, it is undisputed that under Alabama law, a party who suffers injury to, or taking of, his real property is entitled to damages for the intended highest and best use of that property, even if the property was not being used in that manner at the time of the loss.  *See, e.g., W.T. Smith Lumber Co. v. McKenzie*, 55 So.2d 919, 920-21 (Ala. 1952) ("The adaptability of the property taken o[r] injured for a special purpose affecting its value is an element for the consideration of the jury in assessing the damages."); *Historic Blakely Authority v. Williams*, 675 So.2d 350, 352 (Ala. 1995) ("In a proceeding to determine just compensation, the landowner is entitled to have the value of the property determined based on its highest and best use."); *State v. Bryant*, 475 So.2d 1184 (Ala. 1985) ("It is always relevant to inquire into the various elements of value, such as the uses to which the property is adapted, although not presently so used, if it appears that such prospective use affects the present

---

[26] And even the *Overholtzer* case leaves room for debate on the issue of valuing property in title insurance disputes.  *See Anderson v. Fidelity Nat'l Title Ins. Co. of California*, 17 Cal. Rptr. 2d 539, 540 (Cal. Ct. App. 1993) ("The essence of *Overholtzer* is that the insured's expectations are paramount.").

market value of the land. Any question as to the plausibility of the prospective residential use goes to the weight of the evidence, not to its admissibility.").

What can not be decided by this court at this stage in the proceedings is whether Shelby Realty's intended use of the Property as condominiums was real or speculative. Alabama law is clear that fair market value cannot be based on speculation and conjecture "but rather must be based upon the highest and best use to which the property can be expected to be put in the immediate future." *Bohr v. First Am. Title Ins.*, 2008 WL 2977353 at *6, n.13 (M.D. Fla. 2008). That is a question of fact to be left to the jury. *See W.T. Smith Lumber Co. v. McKenzie*, 55 So.2d 919, 920-21 (Ala. 1952) ("The adaptability of the property taken o[r] injured for a special purpose affecting its value is an element for the consideration of the jury in assessing the damages.") (internal citations omitted); *see also* Alabama Law of Damages § 36:5 (5th ed.) ("The adaptability of the property injured for a special purpose affecting its value is also an element for consideration by the jury in assessing damages."). The motion for summary judgment, on the ground that Shelby Realty has been paid in full, is therefore due to be denied.

### B.     The Counterclaims

On March 6, 2008, when it answered the Complaint, Shelby Realty asserted several counterclaims against Stewart Title: breach of contract (Count I); bad faith (Count II); breach of title insurance policy (Count III); and misrepresentation (Count IV). (*See generally* Doc. #6). In the pending motion for summary judgment, Stewart Title contends that it is entitled to judgment as a matter of law with respect to all counterclaims asserted by Shelby Realty.

### 1.    Breach of Contract/Breach of Title Insurance Policy[27]

Shelby Realty's first and third counter claims assert causes of action for breach of contract (Count I) and breach of title insurance policy (Count III).   In Alabama, a successful breach of contract claim requires proof of: (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.  *See Reynolds Metals Co. v. Hill*, 825 So.2d 100, 105 (Ala. 2002).   Here, the dispute centers on whether Stewart Title fully compensated Shelby Realty for losses covered by the Policy.   And because of material disputed issues of fact, that question cannot be answered on summary judgment.   *See* Section IV.A.2., *supra*.

### 2.    Bad Faith

Shelby Realty's second counterclaim attempts to assert a cause of action for bad faith.   (*See* Doc. #6 at ¶¶ 24-29).   In order to recover on a "normal" bad faith claim, the plaintiff must prove: (1) the existence of an insurance contract; (2) an intentional refusal to pay the claim; and (3) the absence of any lawful basis for refusal and the insurer's knowledge of that fact or the insurer's intentional failure to determine whether there is any lawful basis for its refusal.   *See Jones v. Alfa Mut. Ins. Co.*, 1 So.3d 23, 32 (Ala. 2008).   For a "normal" bad faith claim to be submitted to the jury, the underlying contract claim must be so strong that the plaintiff would be entitled to a pre-verdict

---

[27] Stewart Title contends that the counterclaims for breach of contract and breach of title insurance policy are duplicative.  (*See* Doc. #26 at 26).  Shelby Realty disagrees, asserting that breach of title insurance policy has been recognized by the Alabama Supreme Court as a separate and distinct cause of action from breach of contract.  (*See* Doc. #34 at 55).  This is an issue that need not be decided by this court at this time.  If the title insurance cause of action is subsumed by the breach of contract cause of action, then disputed issues of material fact prevent summary judgment. (*See* discussion, Section IV.A., *supra*).  If there does exist a separate and distinct cause of action for breach of title insurance policy, Stewart Title has not moved for summary judgment as to that claim. (*See* Doc. #26 at 26-28).

judgment as a matter of law.  *See id.*  However, the abnormal case dispensed with the predicate of

a pre-verdict judgment as a matter of law, allowing bad faith to consist of: (1) intentional or reckless

failure to investigate a claim, (2) intentional or reckless failure to properly subject a claim to a

cognitive evaluation or review, (3) the manufacture of a debatable reason to deny a claim, or (4)

reliance on an ambiguous portion of a policy as a lawful basis for denying a claim.  *See id.*  But in

either case, the ultimate question is whether there is a debatable reason for denying the claim.  *See*

*State Farm Fire & Cas. Co. v. Balmer*, 672 F. Supp. 1395 (M.D. Ala. 1987) (citing *Jones*, 507 So.2d

at 402).

> Although the insured can use the intentional failure to determine whether or
> not there was any lawful basis for refusal of the claim (i.e., tier two of the
> *Chavers* test)[28] as evidence that no lawful basis for refusal ever existed, the
> fact remains that in order for the insureds to recover on the tort of bad faith,
> no lawful basis must exist for the insurer's denial of the claim. *See Barnes*,
> 405 So.2d at 924; and *Lavoie*, 470 So.2d at 1082 (Torbert, C.J., dissenting).
> In other words, an insurer's intentional, reckless or negligent failure to
> investigate or evaluate a claim is only an element by which the insured may
> prove that no lawful basis for refusal existed. The insurer's "subpar"
> investigation cannot in and of itself sustain a tort action for bad faith.

---

[28] In *Chavers v. National Security Fire & Cas. Co.*, 405 So.2d 1 (Ala.1981), the Supreme
Court of Alabama first recognized an actionable tort for an insurer's intentional refusal to pay a
direct, first party claim.  In *Chavers*, the Court held that there was implied by law a duty of good
faith and fair dealing in contractual relationships. Bad faith was defined by the Court as "the
intentional failure by the insurer to perform this duty implied in law." *Id*. at 5.  The *Chavers* Court
went on to hold that:

> [A]n actionable tort arises for an insurer's intentional refusal to settle a direct
> claim where there is either (1) no lawful basis for the refusal coupled with
> actual knowledge of that fact or (2) intentional failure to determine whether
> or not there was any lawful basis for such refusal.

*Id.* at 7.  Accordingly, a two-tier test was established by which to determine whether an insurer had
acted in bad faith in refusing to pay a direct claim on a policy of insurance.

. . .

> [T]he focusing of the inquiry in bad faith claims on whether there is a
> debatable reason for denying the claim and generally away from the conduct
> of the insurer in investigating and evaluating the claim does not mean the law
> condones an insurer's conduct in not properly investigating and evaluating
> the claim. [Instead, the focus of the inquiry] stems from the recognition that
> without a threshold determination that the insurer had no debatable reason for
> denying the claim, the insured was in essence not injured for the insured had
> no right to immediate payment of the claim. (Footnote omitted.) No matter
> how badly the insurer acted in investigating and evaluating the claim, if there
> was a debatable reason for refusing to pay the claim, when payment was
> refused, the insured was not entitled to prompt payment. If a debatable reason
> exists, the insurer has the "freedom (and, perhaps, the duty) not to honor, and
> thus legally dispute, claims of questionable validity." *Chavers I* at 6 (quoting
> from Justice Jones' special concurrence in *Vincent* [ *v. Blue Cross-Blue
> Shield of Alabama* ], 373 So.2d 1054 (Ala.1979)). The lack of proper
> investigation and evaluation is significant in proving [the crucial] element of
> the tort, namely knowledge by the insurer of the lack of a debatable reason.
> *Barnes* at 924.

*Balmer*, 672 F.Supp. at 1406.  Shelby Realty's brief informs the court that the counterclaim is one

for "abnormal" bad faith stemming from the failure to investigate prong.  (*See* Doc. #34 at 50-54)

("These actions, or more precisely, the lack of any investigation, constitutes an abnormal bad faith

denial of Shelby Realty's claim under the Policy.") (emphases omitted).

This court has already determined that it cannot, based on the existence of material issues of

disputed fact, decide the issue as to whether or not Stewart Title properly paid Shelby Realty's claim.

(*See* Section IV.A., *supra*).  What that determination does is highlight to the court that Stewart Title

did, in fact, have a debatable reason to deny Shelby Realty's claim.  And that debate negates Shelby

Realty's counterclaim for bad faith.  Therefore, Stewart Title's motion for summary judgment, as

it relates to Count II of the Counterclaims, is due to be granted.

### 3. Misrepresentation

Shelby Realty's fourth counterclaim attempts to assert a cause of action for misrepresentation. Specifically, it is alleged that Shelby Realty "was entitled to rely upon the expertise of Stewart Title to determine if any encumbrances upon the Property prevented Shelby Realty from holding title to the Property in fee simple" and that "Stewart Title represented to Shelby Realty that Shelby Realty acquired title to the Property in fee simple." (*See* Doc. #6 at ¶¶ 35, 37). That counterclaim fails on at least two fronts. Not only does the title insurance policy fail to represent that Shelby Realty actually had fee simple title to the Property, but the Alabama Title Insurance Act, Ala. Code § 27-25-1 *et seq.*, establishes that tort liability cannot attach as a result of a title search.[29] (*See* §27-25-3(10)) ("The search of the public records relating to matters of title performed in connection with the issuance of a preliminary report, commitment, or binder shall be solely for the benefit of the title insurance company requested to issue its policy or policies or title

---

[29] The court is aware that Alabama appellate courts have not yet had the occasion to construe the Alabama Title Insurance Act as related to any representation of condition of title. However, following the passage of the Alabama Title Insurance Act, Title Law in Alabama represented the following:

> With the passage of the Act, Alabama joins California and other jurisdictions in recognizing that a title search performed prior to the issuance of a title commitment is not in the nature of an undertaking to prepare an abstract for the benefit of a proposed insured; rather, it is something done solely for the benefit of the title insurer. This is consistent with the view that a title insurer performs an examination of title to reduce or eliminate its underwriting risks. Careless underwriting should result only in greater claims for indemnity under the policy, not in tort liability predicated on abstractor's negligence or suppression.

James A. Bradford and Warren Laird, TITLE LAW IN ALABAMA, p. 137 (2002). Shelby Realty does not address the argument that tort liability cannot lie on title commitments, citing only to the black letter law of misrepresentation, which Alabama has not held to be applicable to title insurance disputes. (*See* Doc. #34 at 57-58).

insurance."). Therefore, Stewart Title's motion for summary judgment, as it relates to Count IV of Shelby Realty's counterclaims, is due to be granted.

**V.       Conclusion**

For the foregoing reasons, the June 25, 2009 motion of Plaintiff Stewart Title Guarantee Company for summary judgment (Doc. #25) is due to be granted in part and denied in part.  A separate order will be entered.

**DONE** and **ORDERED** this _____29th_____ day of January, 2010.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE